[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The amended complaint of the plaintiff, William T. Carron is in two counts. The first count alleges that the defendant, Leader Beverage Corporation, on December 3, 1993, terminated his position as sales manager for the company because he had filed a worker's compensation claim for injuries suffered as the result of an automobile accident on October 29, 1933, in violation of Connecticut General Statutes § 31-290a.
The second count alleges that the defendant failed to pay the plaintiff certain earned bonuses in violation of Connecticut General Statutes § 31-71 (c).
 I
With respect to the first count, the evidence disclosed that the plaintiff had worked in the sales department of the defendant beverage company from 1980 to 1993 when he was terminated on December 3. The plaintiff's claim is that the termination was motivated by and in retaliation for the plaintiff's filing of a workman's compensation claim as the result of injuries suffered in an automobile accident on October 29, 1993.
Connecticut General Statutes § 31-290a, in essence, provides that no employer subject to provisions of the Worker's Compensation Act shall discharge any employee who has filed a claim for benefits under this section.
In actions brought under Connecticut General Statutes § CT Page 674831-290a, our Supreme Court in Ford v. Blue Cross-Blue Shield ofConnecticut, Inc., 216 Conn. 40, at page 53, set forth the burden of proof requirements, particularly, the order of presentation of proof in cases brought under this section, as follows:
 The plaintiff bears the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination. In order to meet this burden, the plaintiff must present evidence that gives rise to an inference of unlawful discrimination. If the plaintiff meets this initial burden, the burden then shifts to the defendant to rebut the presumption of discrimination by producing evidence of a legitimate non-discriminatory reason for its actions. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." The plaintiff then must satisfy her burden of persuading the factfinder that she was the victim of discrimination "either directly by persuading the court [or jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."
To meet this initial burden of proving a prima facie case of discrimination, the plaintiff introduced evidence as follows:
Following the accident of October 29, 1993, he was treated by a Dr. Sorge at a walk-in clinic. Several days later, upon recommendation of Dr. Sorge, he saw a Dr. Shanley who put him on medication, physical therapy and rest. Apparently, he was told by Dr. Shanley to stay out of work. At any rate, he remained out of work until November 12, 1993, when he was requested to come into help straighten out a problem which had arisen with one of the chain store accounts, Pathmark. Although not yet released by Dr. Shanley, he testified he was told by John Leader, Chief Operating Officer of the defendant company, "to get into a fetal position, if necessary, to do the work." As the court understands it, the problem involved Pathmark's claim that it was being overcharged on billings from the defendant, and had been for some period of time. Josephine Battinelli, Vice-President and Financial Officer of Leader Company was unable to solve the problem, leading to calling in the plaintiff, who explained that the conflict arose because Pathmark was not being given discounts which had been CT Page 6749 agreed upon, and the problem was solved immediately.
The plaintiff testified further that William Leader, Chairman of the Board and Chief Executive Officer of the company complained that the plaintiff was treating with Dr. Shanley and wanted a change of doctors. Further, John Leader requested the plaintiff to return to work and obtain a return to work notice.
Under the principles enunciated in the Ford case, supra, once the plaintiff meets the initial burden of proving a prima facie case of discrimination, "the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for its actions." Ford at page 54.
To meet this burden, the defendant introduced testimony that there had been a deterioration of the relationship between the parties extending back over several years prior to the discharge of December 3, 1993.
The plaintiff was brought into the Leader Company in 1980 and assigned the job of general sales manager for all of Fairfield County, including chain store and what was known as IBS (Independent Business Sector). As such, the plaintiff had supervision of all people involved in sales. Sometime after January of 1982, the Brookfield operation of Fairfield County was changed and made a separate operation under the supervision of another sales manager. John Leader testified that the Pathmark billing incident was the "last straw," stating that it resulted from a failure of communication between the plaintiff and the office and various sales managers. John Leader had been upset for over a year because the plaintiff failed to give information to people responsible to inform the accounting department. In January 1993, there had been a meeting with the plaintiff over some of the IBS problems. Reports regarding the IBS outlets were supposed to be filed weekly but were not. Complaints were received from beverage companies such as Pepsi-Cola and a tour of three IBS accounts revealed that they were in bad shape, such as coolers containing products other than those dispensed by Leader. As a result, he met with the plaintiff in August 1993, telling him that he, the plaintiff would be held responsible and would have one month to remedy the IBS situation.
Testimony from William Leader substantiated John Leader's testimony. Following John Leader's tour of the three IBS CT Page 6750 accounts, William and John Leader conducted a survey of one hundred such accounts and found that products were not represented and company coolers actually contained rival products. As a result, the plaintiff's responsibilities were reduced approximately 50% and he was directed to take charge of chain stores only.
In passing, the court notes that the plaintiff's personal problems were causing some difficulties. He was having marital difficulties, which ultimately wound up in divorce court.
Finally, William Leader testified that he didn't know that John would fire the plaintiff, and that his only reason for suggesting another doctor was that previous relations with Dr. Shanley had left him with negative feelings about Dr. Shanley.
In his post-trial memorandum counsel for the plaintiff made claim that only at the time of trial did the defendant create a long list of poor job performances and that such list was undocumented. While the court agrees that statements by John Leader in asking the plaintiff to return to work were crude and insensitive, the fact remains that the plaintiff offered practically nothing to show that the defendant's explanation for termination was "unworthy of credence."
Considering the totality of circumstances surrounding the plaintiff's termination, the court is unable to come to a determination that such was caused by his filing a worker's compensation claim.
As to the first count of the plaintiff's complaint, the issues are found in favor of the defendant.
 II
The second count of the amended complaint claims bonuses due to the plaintiff which were not timely paid, and, under Connecticut General Statutes § 31-72, the doubling of such sums together with attorney's fees.
The first claim, under paragraph 3 of the amended complaint, alleges that during the first quarter of 1992, the plaintiff earned a bonus of $8,974.30 but was only paid the sum of $2,541.30 leaving a balance due of $6,433. This claim centers around circumstances involving the acquisition of a new account CT Page 6751 in 1991, 7 UP, for which it was determined bonuses would not be paid, since there would be no comparison with sales of previous years. Subsequently, however, according to the plaintiff, he discussed the matter with John Leader, who agreed that the bonus program would include 7 UP sales. However, when William Leader who had been in Florida heard about it, he rescinded John Leader's decision and a revised budget was prepared, defendant's Exhibit 1, reflecting such rescission.
Further testimony revealed that in January of 1994, the plaintiff had met with John Leader at a Penny's Diner and that during such meeting there was discussion of a check for $10,000 to cover bonuses. Plaintiff's Exhibit J, of June 10, 1994, is a letter referring to this check, and inquiring why the same had not been paid. The court is frank to confess that it doesn't understand the entire testimony relating to such $10,000 check and is unable to find that it has any relevancy to the present claims under count II of the amended complaint.
The court is unable to find that the plaintiff is due any bonuses based on 7 UP sales.
The decision not to include 7 UP sales in the bonus structure was originally made by William Leader and changed during his absence from the scene. When William Leader heard about it, he immediately rescinded it, and the plaintiff was asked to prepare a revised budget, reflecting such rescission. There is no testimony that he objected to the revision at the time, and, as is pointed out in the defendant's Post Trial Memorandum, this issue was not raised until the filing of the amended complaint dated October 21, 1996, some four and a half years after the bonus due date of April 1, 1992.
With respect to the claim in paragraph four of the amended complaint, the defendant has conceded that the amount of $5,301.25 is due, and was due as of January 1993. However, at the time of due date, the plaintiff was involved in a divorce proceeding and requested that it be withheld so that it would not be reflected as part of his assets. Under such circumstances, the plaintiff cannot claim double damages or attorney's fees. Such penalties are "inappropriate in the absence of a finding of bad faith, arbitrariness or unreasonableness." Sansone v. Clifford,219 Conn. 217, 229. As heretofore noted, on June 10, 1994, the plaintiff did send a letter, plaintiff's Exhibit J, requesting the payment of bonuses in the amount of $10,000, as consented to CT Page 6752 by John Leader. The court still doesn't understand the amount of $10,000, but will presume that such request did include the amount of $5,301.25 which is not disputed by the plaintiff.
As to paragraph five of the plaintiff's amended complaint, which claims a bonus of an unknown amount for the fourth quarter of 1993, the court has no evidence upon which it might make a decision or base an award.
Judgment may enter in favor of the plaintiff to recover of the defendant the sum of $5,301.25 together with costs and interest from June 10, 1994 to the date of payment of judgment.
BELINKIE, JUDGE REFEREE